VICTORIA CAPELLA, ETC., ET AL., Plaintiffs and Appellants, *v.* FRANCISCO CARRERAS MÁRQUEZ ET AL., Defendants and Appellees.

No. 6359.    Argued February 7, 1935.—Decided July 11, 1935.

*Cayetano Coll Cuchí* and *Estrella García Capella* for appellants.    R. *Cuevas Zequeira* for appellees.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

The Asociación Popular Cooperativa de Construcciones, Ahorros y Préstamos de Puerto Rico segregated from a rural property belonging to it, known as "Miramar," in the ward of Santurce, a parcel of land with the object of dedicating the same to an improvement project, by dividing it into 16 blocks with 215 lots, and into streets and avenues called Palma Avenue, Miramar Avenue, Olimpo Avenue, and Central, Unión, Estado, Naranjo, Congreso, Roosevelt, Nueva, Comercio, McKinley, and Laguna Streets, and Elliot Place. On one of the lots sold marked No. 55, which belongs at present to the plaintiffs Antonia Martínez Capella, Victoria

Capella, and Antonia Capella, a single-story frame house, zinc-roofed, and a two-story frame house, with galvanized-iron roof, were built. Plaintiffs' lot is bounded by several lots that were acquired by Rosa Lluberas, who grouped her parcels into a single property, where a re-enforced concrete house was built sometime in 1917 or 1918. This property was sold in 1927 to Arturo Lluberas Rodríguez, brother of the vendor Rosa Lluberas. The improvement project in question was constructed on the basis of a plan which divided the land into blocks and subdivided it into residential lots, marked, numbered, and intersected by streets and avenues. One of the latter, Palma Avenue, extended in front of the lots of the plaintiffs and of the defendants.

In the complaint it is alleged that the defendant Rosa Lluberas, in constructing her house, built a concrete wall around her lots as well as a wooden fence more than three meters high and eleven and one-half meters long across Palma Avenue, thus obstructing this street throughout its entire width and leaving no space for traffic. The fence having been destroyed by the plaintiff Victoria Capella, the defendant Rosa Lluberas and her husband Francisco Carreras Márquez built another fence on Palma Avenue, which this time was made of galvanized iron, over the same place and in identical conditions to the first, and once more against the protest of the plaintiffs, lessees and neighbors, as alleged in the complaint. Plaintiffs allege that Palma Avenue has a precipice on its outer border, and that after the defendants fenced the whole width of this avenue, the only thing remaining is the border of the precipice which is absolutely irregular and muddy and through which water runs continuously, and that it is over that strip that plaintiffs have been compelled to pass in coming to and going from their house ever since Rosa Lluberas fenced Palma Avenue for the first time. The prayer is for a judgment directing the defendants to forthwith remove the public nuisance placed and kept by them

on Palma Avenue, and to pay the damages caused to the plaintiffs.

As Rosa Lluberas Rodríguez died, she was substituted as defendant by her adopted daughters and heirs, Rosaura, Blanca Alicia, Ester María, Lydia María, Avilda, Aida, Aida Zoraida, and Alpha Antonia Ortiz Lluberas.

The defendants denied that Rosa Lluberas had built a fence made of wood or of any other material on Palma Avenue, or that they had interrupted the traffic over any public highway in Miramar, or that there existed any street or avenue on the place where they built the fence, or that the same interrupted traffic to the prejudice of the plaintiffs.

At the close of plaintiffs' evidence the defendants presented a motion for nonsuit, and the court sustained the same and then rendered judgment for the defendants, without special imposition of costs. From said judgment the plaintiffs took the present appeal.

It is urged that the court erred in not holding that the evidence failed to establish that Palma Avenue is a municipal street opened to the public traffic in the Municipality of San Juan. It is further urged that the court erred in finding that the fence constructed by the defendants was built on land belonging to them, and that the evidence presented was insufficient to support the allegations of the complaint. Although six errors are assigned as committed by the lower court, the same may be practically condensed into the three that we have just mentioned.

The defendants, through their learned counsel, maintain that the fact that the owners of a parcel of land should have decided to improve *(urbanizar)* it and lay out on the map or plan of such improvement project a series of streets to be constructed, does not establish the existence of such streets, unless it is shown as a separate and distinct fact that the plan in question was duly developed by constructing the streets to which the drawing makes reference. It is argued that the evidence has shown that all the streets of the Mira-

mar Project were duly constructed and opened to the public, with the exception of the one known as Palma Avenue, which is a fanciful and entirely imaginary highway, which has only existed on the plan drawn by the original owners of the parcel that was to be improved. It is further said that an attempt has been made to show that the land improved was delivered to the municipality and that, if this was so, the latter entity should have built Palma Avenue and dedicated it as a municipal street to the public use.

The defendants insist that the evidence introduced has failed to establish a prima facie case in favor of the plaintiffs. The court so held when it dismissed the complaint. We shall examine the evidence adduced in order to see whether or not the findings of the court below may be upheld.

■■■ We have already stated that the improvement of the parcel of land known as Miramar was made on the basis of a plan wherein the lots to be sold were marked and numbered and the streets to be constructed are mentioned, among them Palma Avenue. The lots purchased by Rosa Lluberas were included in the improvement project. When in 1927 she sold the recorded lots to her brother, Arturo Lluberas, Rosa Lluberas described the consolidated property, stating that it had been formed of lots numbered 42, 43, and 56 of block N of the improvement project of a tract of land situated in a place known as Miramar, and that she acquired the lots composing said property by purchase from the Asociación Popular Cooperativa de Construcciones, Ahorros y Préstamos de Puerto Rico and from Arturo Lluberas Rodríguez and his wife, Asunción Negroni Albelda.

There is evidence in the record tending to show that the tract was improved and its streets dedicated to the public use and delivered to the Municipality of San Juan. If there is also evidence tending to prove the averments of the complaint with regard to the disturbance caused to the plaintiffs we are bound to reverse the judgment appealed from, inasmuch as a motion for nonsuit based on the insufficiency of

the evidence cannot prosper when a prima facie case is established in favor of the plaintiff. And if an improvement project is laid out on lands divided into blocks and subdivided into parcels or lots for residential purposes, intersected by streets, avenues, and alleys, it is natural and just that the owners of those lots should have access to the streets for the benefit of their property and that they be entitled to demand the abatement of any disturbance or nuisance caused by another person to the prejudice of their rights.

In the case of *Messick* v. *Kincaid,* 147 Ky. 680, a parcel of land was sold situated to the north of a street which did not extend far enough to reach the front of said parcel. The property described was ceded to the Board to be used as a public street of the city, for the benefit of adjacent owners and of all persons passing thereon. Later, the original owner sold to the same purchaser another lot situated to the west of the one formerly bought. Thereafter the vendor drew and recorded a document wherein he attempted to recover a parcel situated on the southwest corner of the strip of land that he had dedicated to the city. Then he fenced up the said parcel, which was immediately in front of the second lot sold, and took possession thereof. The interested party brought suit against the vendor to enjoin him from fencing up the land and from interfering with the free use of the portion of the street that had been dedicated to the city and to order him to remove the fences and obstructions that he had placed on said street. The Kentucky Court of Appeals in deciding the question raised, expressed itself as follows:

"At the outset it 's insisted for appellant that no cause of action for injunctive relief is presented by the record in this case. In *Alexander, &c.* v. *Tebeau, &c.,* 24 Rep., 1305, this identical question was before the court. Plaintiffs there sought to have the defendants enjoined from closing a ten foot alley in the rear of their property. A demurrer was sustained to the petition and, upon consideration here, the court said of these acts on the part of the defendants:

" 'They have no more right to fence up this alley on which her coal house and stable front than they would have to close Florence Place on which her residence fronts. It was dedicated to the public in the original plat subdividing the property into lots for sale, and the deed by defendant, Dulaney, &c., to their vendor, Willis, calls for it. We are of opinion that in so far as the petition sought to restrain defendants from fencing up or in any wise interfering with plaintiff's right to the use and enjoyment of this alley that the petition set up a good cause of action, and the demurrer should have been overruled.'

"Most applicable to the case at bar is the language quoted. Here the appellant had laid out a portion of her property into lots and, in order to sell them, had dedicated to the city a strip of ground in front of the lots, making an extension of Green street. On the faith of such dedication a sale of one of said lots had been made to appellee, and appellant will not now be heard to say that the property dedicated to the trustees of the city for a street has not been accepted by the city for that purpose. Nor can she reinvest herself with title thereto, for appellee and others who may have purchased lots have acquired an interest in and a right to the use of this property dedicated by appellant for street purposes. Not having the right to reinvest herself with the title to this property, it must be treated, at least so far as she is concerned, as one of the public ways of the town and, being such, she had no right to obstruct its free use by appellee or others who desired to use it. There is no merit in the defense. Appellee was entitled to the relief sought and the chancellor correctly so held."

In *Sexton et al.* v. *Corporation of Elizabeth City,* 86 S. E. 344, the Supreme Court of North Carolina said:

"We may say generally, that the right to the easement in a public highway may be acquired by grant or dedication, by the exercise of the power of eminent domain, or by user for the requisite length of time. *Kennedy* v. *Williams,* 87 N. C. 6. With respect to dedication, we have held in several cases that where the owner of real property lays out a town or village upon it, or even a plat of ground, and divides it into blocks or squares, and subdivides it into lots or sites for residences, which are intersected by streets, avenues, and alleys, and he sells and conveys any of the lots with reference to a plan or map made of the property, or where he sells or conveys according to a map of the city or town in which his land is so laid off, he thereby ·

dedicates the streets and alleys to the use of those who purchase the lots, and also to the public, under certain circumstances not necessary to be now and here stated; and this is so unless it appears either by express statement in the conveyance or otherwise that the reference to or mention of the street or streets was solely for the purpose of description, and not intended as a dedication thereof. The same rule is said to apply to such pieces or parcels of the land marked on the plat or map as squares, courts, or parks. The reason for the rule is that the grantor, by making such a conveyance of his property, induces the purchasers to believe that the streets and alleys, squares, courts, and parks will be kept open for their use and benefit, and having acted upon the faith of his implied representations, based upon his conduct in platting the land and selling accordingly, he is equitably estopped, as well in reference to the public as to his grantees, from denying the existence of the easements thus created. Many authorities sustain the principle, and the dedication, when once fully made, is held to be irrevocable. (Citations.)

"In *Smith* v. *Goldsboro*, 121 N. C. 350, 28 S. E. 479, *Conrad* v. *Land Co., supra*, and *Collins* v. *Land Co.*, supra, the principle is discussed with reference to suburban land which is divided into lots, with intersection streets and alleys and parks and squares, and is afterwards included within the corporate limits of a town, to which case it is held to be applicable. The court said in *Conrad* v. *Land Co., supra*, 126 N. C. at page 779, 36 S. E. at page 283:

" 'If the owner of land lays it off into squares, lots, and streets with a view to form a town or city, or as a suburb to a town or city, certainly if he causes the same to be registered in the county where the land is situated, and sells any part of the lots or squares, and in the deed refers in the description thereof to the plat, such reference will constitute an irrevocable dedication to the public of the streets marked upon the plat . . . We think the same principle would apply to those pieces of land which were marked on such a plat as squares, or courts, or parks, and that streets and public grounds designated on such a map should forever be open to the purchasers and to the public . . . It is immaterial whether the public authorities of the city or county had formally accepted the dedication of the court. The plaintiffs had been induced to buy under the map and plat, and the sale was based, not merely on the price paid for the lots, but there was the further consideration that the streets and public grounds designated on the map should forever be open to the purchasers and their assigns.' (Citations.)"

In *Tesson* v. *H. K. Porter Co.*, 238 Pa. 504, 86 Atl. 278, the following was said:

"If anything is to be regarded as settled, it is that, when one who is the owner of a tract of land in a municipality cuts it up into lots and sells them as laid out on a plan which he has adopted, showing streets and alleys thereon, there is not only an implied covenant by him to the owner of each lot that the streets and alleys, as they appear upon this plan, shall be forever opened to the use of the public, but a ded:cation by him of the same as highways to the use of the public forever; and the municipality itself cannot extinguish the easement which each lot owner thus acquires by private contract with the owner of the plotted ground."

In *Merino* v. *George F. Fish, Inc.*, 153 Atl. 301, the Supreme Court of Connecticut expressed itself thus:

"The judgment of the trial court that the Merinos had the right to use th:s way was based upon a cross-complaint filed by the defendant in which it sought a declaratory judgment, among other things, as to whether or not the plaintiffs had any right to use any portion of its land; and the judgment is not open to the objection that it is not supported by the pleadings. In *Whitton* v. *Clark*, 112 Conn. 28, 32, 151 A. 305, 307, we recently said: 'The law is well settled that where an owner of land causes a map to be made of it upon which are delineated separate lots and streets and highways by which access may be had to them, and then sells the lots, referr:ng in his conveyances to the map, the lot owners acquire the right to have the streets and highways thereafter kept open for use in connection with their lands. It is true that we there restricted the right of a purchaser to have the streets and highways kept open so that it would not include any street delineated upon the map, which was not, and would never in all likelihood prove, of any benefit to the lot he bought. In the instant case the trial court's finding amply shows that the right of the Merinos to use the proposed street to get to Ridge road was of benefit to them in the ownership of the lots they bought of Davis, and th's restriction does not apply. The right acquired by a conveyance based upon such a map as the one before us is a private right, and may exist entirely apart from the creation of a highway over the proposed street delineated upon it. 'The existence of a right of way in the vendee by reason of the sale to him by reference to a plat is entirely independent of whether any right exists

in the public. For instance, although the public authorities refuse to accept the dedication, or vacate a street appearing on a plat, so that the dedication of the street is practically a nullity, nevertheless the vendee's right remains the same as if the authorities had not taken such action.' (Citations). So much of the defendant's brief as is addressed to the failure of Davis effectually to dedicate the proposed street is not pertinent to the issues which this appeal presents; nor is there occasion to follow that brief in its discussion of the statutes permitting the filing of maps in the town clerk's office, as the right of the Merinos arose from the conveyance to them upon the basis of the map and in no way could be affected by its filing in the town clerk's office.''

. In *Town of Leeds* v. *Sharp* (Ala. Sup.), 118 So. 572, the court said:

''The argument in favor of the relief sought rests upon the contention that there has been a common-law dedication. No controversy arises as to the general rule of law here applicable. To establish such a dedication the 'clearest intention' on the part of the owner must be shown, and the burden of proof rests on complainants. 'To discharge this burden . . . the evidence must be clear and cogent, and the acts of the owner relied on to establish a dedication must be convincing of an intent to dedicate the property to public use, and such acts must be unequivocal in their indication of the owner's intention to create a public right exclusive of his own.' *City of Florence* v. *Florence Land Co.*, 204 Ala. 175, 85 So. 516. 'The existence *vel non* of the requisite intent is not to be ascertained, however, from the purposes ''hidden in the mind of the land owner,'' but is read by the court from acts of the owner.' *East Birmingham Realty Co.* v. *Birmingham Mach. Co.*, 160 Ala. 461, 49 So. 448. 'A ''dedication'' is a donation or appropriation of property to public use by the owner, accepted by the public. It may be in writing or in parol; may be evidenced by words or acts; by one declaration or unequivocal act, or by a course of conduct evincing a clear purpose to dedicate.' *Hill* v. *Houk*, 155 Ala. 448, 46 So. 562 . . . 'Where an owner causes his lands to be surveyed and platted, whether the plat be recorded or not, and proceeds to sell one or more lots according to the plat this is a completed dedication of the streets laid out on the plat. The purchase of lots constitutes an acceptance which inures to the public. An element of estoppel enters into this form of dedication. The obligations of good faith arise by thus holding out to the public the use of the

proposed streets as an appurtenance to the property offered for sale.' *Manning et al.* v. *House,* 211 Ala. 570, 100 So. 772.''

From the above decisions it follows, in the first place, that once an improvement project is laid out by dividing a parcel of land into blocks, lots, and streets, the owner of the lots sold within the improvement project is precluded from denying the use of the streets so laid out to his vendees, and, in the second place, it is also inferred that the owners of the lots acquire the right to use the streets laid out for the benefit of their lots, not only as against the vendor but also as against any person who may limit and disturb the use and enjoyment of the property. Persons purchasing according to the improvement plan acquire rights and contract duties of a reciprocal character, one of such rights being that of having access to the streets laid out in the plan for the benefit of their lots and to be respected in the use of such streets. But even if it were otherwise, if the original owner of the land dedicated to streets can not prevent the purchasers from using them, much less can a person having no title over said land prevent such use, especially if he is the owner of a lot acquired under the improvement project. As the Supreme Court of Connecticut has aptly said: "The law is well settled that where an owner of land causes a map to be made of it upon which are delineated separate lots and streets and highways by which access may be had to them, and then sells the lots, referring in his conveyances to the map, the lot owners acquire the right to have the streets and highways thereafter kept open for use in connection with their lands."

It is urged that the only evidence existing in connection with the delivery of the improvement project to the Municipality of San Juan, is a letter with a plan addressed to the Mayor of the city by the Judge of the District Court of San Juan. The improvement project, as inferred from the evidence, shows that the streets and avenues were dedicated to the public use and that lots were sold subject to the plan

adopted. In so far as acceptance is concerned, the same may be express or implied. We do not know how far it may be denied that the Miramar improvement has been accepted by the municipality. From the evidence it might be infer- red that the officers of the municipality acted as if there had been an acceptance. But as regards the rights of the plain- tiffs, this question is of no importance. With or without such acceptance, the purchasers of lots in an improvement project are entitled to avail themselves of the streets dedi- cated to the public use and to demand the removal of any nuisance or disturbance that might impair such right.

The second assignment of error is based on the finding made by the court *a quo* that the defendants had erected the fence in question on land belonging to them. In the state- ment of the case the court says:

"We think that the plaintiffs have really been prejudiced in the enjoyment of their property, ever since the fence to which they refer in their complaint was built by Mrs. Lluberas, that is, since 1917 or 1918, but there is no evidence to show that what Mrs. Lluberas did was an act done on property that did not belong to her."

The evidence presented tends to show that prior to the date mentioned by the court below the plaintiffs had free access to Palma Avenue. With the construction of the fence began the impairment in the enjoyment of plaintiffs' prop- erty. No one can deny the existence in the record of evi- dence tending to show that Palma Avenue has been invaded by the fence constructed by Mrs. Lluberas. It is unnecessary to refer in detail to the testimony of all witnesses or to all the documentary evidence. The lot belonging to the plain- tiffs is situated, according to the deed, on Palma Avenue, northern block; it fronts Palma Avenue on the west and is bounded on the right, which is the south, by lot No. 54, on the left, which is the north, by lot No. 56, now belonging to Rosa Lluberas, and by lot No. 42, and on the rear, which is the east, with lot No. 43, which last two lots also belong to Rosa Lluberas. Lot No. 56, purchased by Mrs. Lluberas,

is bounded on its front, west, by Palma Avenue, on the right, south, by lot No. 55, on the left, north, by lots Nos. 38 and 39, and on the rear, east, by lot No. 42. The parcel occupied at present by the defendants is formed by the grouping of lots Nos. 42, 43, and 56 of the northern block of the improvement project and as thus grouped, is bounded on its front, east, by Miramar Avenue, on the right, north, by the lots belonging to Waldemar E. Lee, Francisco Marco, and Fernando Purón, on the left, south, by lots owned by Guillermo Vidal and Victoria Capella, and on the rear, west and southwest, by the same lot of Victoria Capella and with another lot of Guillermo Vidal, on which side it was formerly bounded by Palma Avenue.

We notice a great change in the description of the lot on its west side. Lot No. 56, which before grouping appeared to be bounded on its front, west, by Palma Avenue, after the grouping appears to be bounded on the west and southwest by the lot belonging to Victoria Capella and another lot owned by Guillermo Vidal, on which side it formerly was bounded by Palma Avenue. There is documentary and testimonial evidence tending to show that Rosa Lluberas constructed a galvanized-iron fence that projects about 11.50 meters within the space occupied by Palma Avenue. We have examined the testimonial evidence introduced by the plaintiffs in connection with the documentary evidence and, in our opinion, this is not a case that may be decided by dismissing the complaint upon a motion for nonsuit. Mr. Montilla, a witness, for example, says among other things that in the work of the project for paving Palma Avenue, in Miramar, he could only prepare the portion lying between Laguna Street and Elliot Place, because at about a distance of 35 meters there is a galvanized-iron fence 11.50 meters deep, occupying almost the whole width of the avenue which is necessary to construct the same. The testimony of this witness is in accord with a communication addressed by him on March 12, 1927, to the Director of Municipal Public Works

of San Juan, stating that in the work comprised in the project for paving Palma Avenue, he could only prepare that portion included between Laguna Street and Elliot Place, because at a distance of 35 meters a galvanized-iron fence 11.50 meters deep was constructed, and the same occupies crosswise the whole space pertaining to the avenue which is needed for constructing the latter. He added that he had surveyed both sides of the lots on Elliot Place and that they all have the length appearing on the plat of the improvement project of Miramar existing in the files of the municipality, and that this shows that the galvanized-iron fence constructed by Mrs. Lluberas prevents the continuation of Palma Avenue. The witness Harry Besosa testified that Rosita Lluberas has constructed a galvanized-iron fence, has deviated the street, and taken part of Palma Avenue; that the street has been obstructed by said galvanized-iron fence and that in order to go through, as he has done, he has had to turn around a precipice which is close to the railroad, full of mud and stones, where one has to pass as if he were crossing a river. Questioned by counsel for the defendants, this witness stated that he said that Rosita Lluberas took a piece of the street because according to the plat of the project there is a street laid out on the plat, and that everyone has purchased according to said plat; that Rosita Lluberas built a concrete fence on her property and later extended the fence towards the wall and built the same of galvanized iron on a place over which the street existing on the plat of the improvement project should have been laid out. The witness testified that he has not examined the title of Rosa Lluberas, but that he has examined his own title as well as the general plat of the project.

Juan Robledo testified that part of Palma Avenue is half paved and part is full of grass, and that the fence of Rosa Lluberas has been constructed over part of the street.

Manuel Ochoa stated that he lived on Palma Avenue, which was a street similar to any other one, open to public

use, and over which everyone traveled, up to the moment when the fence of Mrs. Lluberas obstructed it.

It is not necessary for us to continue presenting the evidence adduced in all its aspects. The foregoing details, taken from a lengthy record, will suffice to show at least *prima facie* the existence of a nuisance caused by Mrs. Rosa Lluberas in constructing the fence which obstructs the right of way and interferes with the free use and enjoyment of plaintiffs' property. In the record there is evidence to show the numerous demands made by the Capella family upon Rosa Lluberas and the Municipality of San Juan. There appears also the testimony of the plaintiffs, which although given by interested parties must be considered by the trial judge the same as any other evidence.

Mrs. Antonia Martínez Capella, in testifying about the difficulties created by reason of the fence, says among other things, as follows:

"Ever since Rosa fenced the street we lost all the comfort we had in our dwelling and it became impossible to live there; no one wishes to come to our house, we are absolutely isolated, enclosed. We have to come to the house because there is nothing else for us to do, but we suffer a great deal in passing around that fence. No space was left when she built the fence the first time, because what is found on the other side of the street is a precipice, full of mud, as all the waters from the yard of Mrs. Lluberas run through that place, so when it rains, when they wash the automobile or water the plants, that narrow alley is always full of mud. In order to travel over that place it was necessary to fix it the best we could. The only thing we could do was to form an alley and in order to do that we had to demolish a concrete wall that there was on our property. Nothing else could be done on that precipice. The narrow alley that we built was not more than a foot wide; it could not be made wider."

From the testimony of Miss Estrella García Capella we take the following extract:

"It is hard to describe the suffering and trouble that we have experienced ever since the fence was built across the street. Whenever we want to go out at night for a stroll and have to walk all around,

we suffer quite a lot. When someone comes for us in an automobile, he cannot stop the car in front of the house and we suffer morally. We are living in a yard, enclosed. Doña Rosita always lived in that place until she died. We constantly appeared before her and before Mr. Carreras and requested them to destroy the fence, explaining to them the situation in which we found ourselves. I spoke to Carreras several times and he always answered: 'Tell your mother to sell her property to my wife and then you can leave the place.' On other occasions I spoke to him and called his attention to the fact that the house was unrented and that my mother could not pay the interest on the mortgage and that they were going to foreclose the same, and he answered: 'My wife says that she will buy the house at public auction when the same is foreclosed.' Whenever Mr. Carreras met me on the streets he always said that he realized our situation but that he could do nothing.

"One was deprived of the most insignificant things in life. When I get home in the evening my greatest pleasure would be to take my grandmother out for a walk on the street, to take her out of that prison, but I cannot do it because she cannot travel over the narrow precipice that they have left after building the fence. When she was to be operated on we had to carry her in arms over that place because the car could not go and pick her up, and she had to be taken to the doctor."

It is not incumbent on us to give an opinion at this time as to the weight that such evidence deserves. We are deciding a motion addressed to the sufficiency of the evidence adduced, which motion, in American legal terminology, is known as a motion for nonsuit. We simply consider this evidence in order to determine whether or not the plaintiffs have made out a prima facie case, and this question is answered by us in the affirmative, because we think that the evidence is sufficient for a determination of the case on the merits, after the defendants have had an opportunity to produce their evidence and establish their defenses.

The judgment appealed from must be reversed and the case remanded to the court below for further proceedings not inconsistent with this opinion.